18-3148-cv
*Sooroojballie v. Port Authority of New York & New Jersey and Gary Frattali*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of June, two thousand twenty.

PRESENT:   ROBERT D. SACK,
           PETER W. HALL,
           JOSEPH F. BIANCO,
                     *Circuit Judges.*

---

NEIL SOOROOJBALLIE,

              *Plaintiff-Appellee*,                    18-3148-cv

        v.

PORT AUTHORITY OF NEW YORK & NEW
JERSEY, GARY FRATTALI, INDIVIDUALLY,

              *Defendants-Appellants*.

---

FOR PLAINTIFF-APPELLEE:          MARJORIE    MESIDOR,   Phillips    &
                                 Associates,  PLLC (Stephen Bergstein,
                                 Bergstein & Ullrich, LLP, *on the brief*), New
                                 York, New York.

FOR DEFENDANTS-APPELLANTS:       KATHLEEN  GILL  MILLER,  The  Port
                                 Authority of New York and New Jersey, New
                                 York, New York.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Kuntz, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED IN PART**, and the case is **REMANDED** for further proceedings.

The Port Authority of New York and New Jersey ("the Port Authority") and Gary Frattali (collectively, "defendants") appeal from the judgment of the United States District Court for the Eastern District of New York, entered on October 5, 2018. Plaintiff Neil Sooroojballie commenced this action against his former employer and supervisor under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. § 1981, alleging employment discrimination on the basis of his race and national origin. On September 17, 2018, a jury found in favor of Sooroojballie on his hostile work environment claim under Title VII and § 1981, awarding him compensatory damages in the amount of $2,160,000 against the Port Authority and Frattali, and punitive damages in the amount of $150,000 against Frattali. Defendants challenge the judgment on the following grounds: (1) the district court should have dismissed the § 1981 claim against the Port Authority at summary judgment because Sooroojballie failed to offer evidence of a municipal policy or custom as required under that statute; (2) the district court erred in allowing time-barred acts and allegedly retaliatory acts to be considered by the jury with respect to the hostile work environment claim, and the admissible evidence was insufficient to support the jury's verdict as a matter of law; (3) the district court erred in its instructions to the jury; (4) the awards for compensatory and punitive damages were excessive, and Frattali was improperly precluded from introducing evidence of his finances in connection with the punitive damages award; and (5) the award for attorneys' fees and costs was excessive. We assume the parties'

familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## I.     Section 1981 Claim Against the Port Authority[1]

Defendants argue that the district court erred in concluding that, because the Port Authority is not a municipality, and Frattali is not being sued in his official capacity, there was no requirement that Sooroojballie demonstrate the existence of a policy or custom under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). *See also Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality—or an individual sued in his official capacity—the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." (citations omitted)).

As an initial matter, Sooroojballie asserts that this challenge is waived because the Port Authority failed to renew it at trial. We disagree. Although a motion at trial pursuant to Rule 50(a) of the Federal Rules of Civil Procedure is necessary to preserve a challenge to the sufficiency of the evidence, "where the trial court's denial of a summary judgment motion is not based on the sufficiency of the evidence, but on a question of law, the rationale behind Rule 50 does not apply, and the need for such an objection is absent." *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004). Here, the district court's determination was not based upon any disputed facts about the Port Authority's structure or purpose, but rather was a legal determination regarding its legal status.[2] Thus, the Port Authority's challenge to that summary judgment decision was not waived,

---

[1] After this lawsuit was filed, this Court held that § 1981 does not confer a private right of action against state actors because 42 U.S.C. § 1983 already contains such a remedy. *Duplan v. City of New York*, 888 F.3d 612, 620-21 (2d Cir. 2018). Thus, we construe Sooroojballie's claim to be brought under § 1983. *See id*.

[2] Although Sooroojballie suggests that he has been prejudiced because he could have offered evidence of a policy or custom if defendants had raised this issue at trial under Rule 50, that assertion is undermined by his failure to offer any such factual evidence in response to defendants' summary judgment motion, which

and the legal issues underlying the denial of summary judgment are subject to *de novo* review. *Keeling v. Hars*, 809 F.3d 43, 47 (2d Cir. 2015).

The Port Authority is "a body corporate and politic" created in 1921 by an interstate compact between New Jersey and New York that was approved by Congress, *see* N.Y. Unconsol. Law § 6451 (McKinney 1922); N.J. Stat. Ann. § 32:1-25 (West 1922); *see also* 42 Stat. 174 (1921), and is referred to "as the municipal corporate instrumentality of the two states for the purpose of developing the port" of New York, N.Y. Unconsol. Law § 6459 (McKinney 1922).  The Supreme Court, in *Hess v. Port Authority Trans-Hudson Corporation*, acknowledged that the Port Authority has been characterized as "a state arm or agency" and as "[a] discrete entity created by constitutional compact among three sovereigns" that "is financially self-sufficient."  513 U.S. 30, 38 n.8 & 52 (1994); *see also* N.Y. Unconsol. Law § 6416 (McKinney 1979) (noting that the Port Authority would be funded by New York and New Jersey until it could "meet all expenditures" itself); N.J. Stat. Ann. 32:1-16 (West 1990) (same).  Moreover, the Port Authority "shall be regarded as performing an essential governmental function in undertaking the effectuation" of its purposes.  N.Y. Unconsol. Law § 6610 (McKinney 1962); N.J. Stat. Ann. § 32:1-35.4 (West 1990). Given the structure, funding, and purpose of the Port Authority, the Port Authority stands in the shoes of a municipality for purposes of § 1981 or § 1983, and the district court erred in concluding otherwise.  *Cf. Raysor v. Port Auth. of New York & New Jersey*, 768 F.2d 34, 38 (2d Cir. 1985) ("[T]he section 1983 claim against the Port Authority was properly dismissed because there was no showing that the injury was caused by execution of a custom or policy of the Port Authority, as required by *Monell . . . .*").  Accordingly, because of Sooroojballie's failure to offer any evidence

---

specifically argued that evidence of a policy or custom was required for liability against the Port Authority under § 1981.  Instead of offering such evidence in his opposition papers, Sooroojballie merely cited case authority relating to the standard under Title VII for imputing liability to an employer.

of a policy or custom that was linked to the alleged constitutional deprivation in the case, the district court erred in failing to dismiss the *Monell* claim against the Port Authority on summary judgment as a matter of law.[3]

## II. Hostile Work Environment[4]

Defendants argue that the district court failed to exclude improper evidence at trial. In particular, defendants assert that certain acts that were time-barred were improperly introduced to the jury. Moreover, defendants contend that Sooroojballie was permitted to testify about his alleged retaliation, a claim dismissed by the district court on summary judgment. Defendants claim that, if this evidence were properly excluded, the non-time-barred acts would be insufficient as a matter of law to support the hostile work environment claim.

To prevail on a hostile work environment claim, a plaintiff must prove: "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[;] and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quotation marks omitted). "[A] plaintiff need not show that h[is] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Redd v. New*

---

[3] We note that the absence of a § 1983 claim against the Port Authority due to a lack of proof of a policy or custom does not affect the Port Authority's liability on the Title VII claim, up to the statutory cap of $300,000. *See* 42 U.S.C. § 1981a(a)(1), (b)(3)(D). Nor does this conclusion affect Frattali's separate liability as an individual under § 1983 for his involvement in creating the hostile work environment. *See Patterson*, 375 F.3d at 226 ("[I]ndividuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment.").

[4] We analyze the hostile work environment claims under Title VII and § 1983 together because, on the issues raised by defendants (except as otherwise indicated), the standard is identical. *See Patterson*, 375 F.3d at 225-27 (comparing hostile work environment claims under Title VII with such claims under §§ 1981 and 1983).

*York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (quoting *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010)). "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). We may consider the following factors to determine whether an environment is hostile or abusive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

### 1. Time-Barred Acts

Sooroojballie filed his discrimination and retaliation complaint with the Equal Employment Opportunity Commission ("EEOC") on July 11, 2014. In its order on the motion for summary judgment, the district court found that all conduct that occurred prior to January 12, 2014—180 days before he filed his EEOC complaint—was time-barred. The acts that were thus time-barred were: (1) Frattali's denial of boiler training for Sooroojballie; (2) Frattali's failure to assist Sooroojballie with the Junior Supervisory Assessment ("JSA") Evaluation, a process by which the Port Authority fills supervisory positions, in June and August of 2013; (3) Frattali's refusal to approve a meal reimbursement for Sooroojballie in November 2013; and (4) the December 30, 2013 counseling memorandum which alleged that Sooroojballie took an extra hour of compensation time. Nevertheless, the district court concluded that such acts were admissible as background evidence to the timely claim.

Defendants contend that this was error because a hostile work environment claim "cannot be used to revive time-barred discrete acts of discrimination." Reply Br. at 2 (citing *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629, 648 (W.D.N.Y. 2014) (explaining that a hostile work

6

environment claim is "not a vehicle for resurrecting time-barred claims")). Moreover, defendants argue that, although an employee could use prior discrete acts as "background evidence" in support of a timely claim, there was no limiting instruction here to inform the jury that these time-barred incidents were merely background and were not actionable.

We review a district court's evidentiary rulings for abuse of discretion, and such rulings will not be disturbed unless they are "manifestly erroneous." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 119 (2d Cir. 2006) (quoting *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir. 1997)). Upon review of the record, we find no abuse of discretion with respect to these evidentiary rulings.

As a threshold matter, the time-barred evidence regarding non-discrete acts—including lack of training, evaluations, and discipline—are admissible to prove a hostile work environment claim under the continuing violation doctrine. Sooroojballie correctly relies on *Davis-Garett v. Urban Outfitters, Inc.*, where we reiterated that, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period*." 921 F.3d 30, 42 (2d Cir. 2019) (alterations in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)). In that case, we held that the district court erred when it held that it could not consider time-barred events in connection "with [its] assessment of liability on the hostile work environment claim." *Davis-Garett*, 921 F.3d at 42. Those events included the denial of training given to younger sales associates, the plaintiff's assignment to "the most unpleasant and arduous duties," and "age-disparaging criticisms daily." *Id.*

We similarly hold here that the time-barred evidence constitutes non-discrete acts that are sufficiently related to the acts that occurred within the limitations period, in that the acts involved

7

the same individual (namely, Frattali) and were part of the same pattern of harassing conduct towards Sooroojballie. Thus, such time-barred evidence was properly considered by the jury in connection with the evidence of harassment that fell within the applicable limitations period.[5]

## 2. Evidence of Retaliatory Acts

Defendants also argue that the district court erred when it permitted Sooroojballie to testify that Frattali issued the counseling memoranda in retaliation for filing his complaint with the EEOC office, given that his claims for retaliation and retaliatory hostile work environment were dismissed on summary judgment. We disagree.

Although the district court dismissed the retaliation claims at the summary judgment stage, we have observed that "one type of hostility can exacerbate" the effect of another. *Terry v. Ashcroft*, 336 F.3d 128, 150 (2d Cir. 2003). It follows that "hostile racial attitudes could have exacerbated the [effect] of retaliation-based . . . hostility and vice versa." *Id.* In this case, while Sooroojballie alleged that the counseling memoranda were produced to retaliate against his filing of the EEOC complaint, it was permissible for the jury to consider whether the counseling memoranda were also issued based on Frattali's racial and national origin animus and contributed to Sooroojballie's hostile work environment. *See id.* (observing that a reasonable factfinder could conclude that both racial animus and a retaliatory motive played roles "in the creation of a hostile

---

[5] In any event, to the extent that any of this time-barred evidence could be construed as a discrete act of discrimination outside the scope of the continuing violation doctrine, the district court correctly determined that such evidence is admissible as background to the acts that fall within the limitations period. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004) ("[E]vidence of earlier promotion denials may constitute relevant 'background evidence in support of a timely claim.'" (quoting *Morgan*, 536 U.S. at 113)). Although defendants point to the lack of a limiting instruction to that effect, defendants did not request one and it was not plain error for the district court to fail to give such an instruction *sua sponte*. *See Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 348 n.1 (2d Cir. 1999). Moreover, with respect to the hostile work environment claim against Frattali under § 1983, this timeliness argument would independently fail because the statute of limitations applicable to claims brought in New York under that statute is three years. *See Patterson*, 375 F.3d at 225.

work environment"); *cf. Feingold v. New York*, 366 F.3d 138, 151 (2d Cir. 2004) ("[W]hile Feingold has not alleged sufficient facts to make out a hostile work environment claim based solely on race, his allegations of racial animosity can nevertheless be considered by a trier-of-fact when evaluating Feingold's religion-based claim."). Therefore, the district court did not abuse its discretion in allowing the counseling memoranda to be considered by the jury in connection with the hostile work environment claim.

### 3. Sufficiency of the Evidence

Defendants also challenge the sufficiency of the evidence supporting the hostile work environment claim. We have explained that, "[i]n reviewing the sufficiency of the evidence in support of a jury's verdict, we examine the evidence in the light most favorable to the party in whose favor the jury decided, drawing all reasonable inferences in the winning party's favor." *Gronowski v. Spencer*, 424 F.3d 285, 291 (2d Cir. 2005). As part of this analysis, "we cannot weigh conflicting evidence, determine the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* at 292. In requesting that this Court disturb the jury's verdict, defendants "bear a heavy burden." *Id.*

Sooroojballie testified that, on three occasions, Frattali made discriminatory comments to him about his race and national origin. First, Sooroojballie testified that Frattali stated, in reference to his national origin, "what is it with you type of people[?] I have two more that's driving me crazy, and now I have you to deal with." J.A. at 514. Second, Sooroojballie testified that Frattali, after a water leak sprung, yelled at him: "You fucking Indian asshole. Shut the pump down. Are you stupid? . . . That's why you people are the way you are." *Id.* at 543. Third, Sooroojballie asserted that Frattali told him that he was a "wanna be" in that "[y]ou Indians want to be Americans," even though Sooroojballie is a U.S. citizen. *Id.* at 544. On the same occasion, Frattali

9

told Sooroojballie that he was "not white" and to "go back to [the] country where [he] came from." *Id.* at 544, 705.

Defendants deny that Frattali made these comments and emphasize that these statements were uncorroborated by any of Sooroojballie's coworkers, and no other employee of color testified about Frattali engaging in racially hostile behavior. Defendants further assert that three remarks over a 12-to-14-month period, after Sooroojballie had worked for two and one-half years under Frattali without any incident, cannot constitute an objectively hostile work environment.

As a threshold matter, the jury was entitled to consider and weigh the credibility of Sooroojballie's testimony regardless of whether it was corroborated. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992) ("The jurors heard both the testimony of [the plaintiff] on the point and that of [another witness], which tended to contradict it. They were free to settle upon which witness they believed."); *cf. Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (contention that the plaintiff's evidence is "uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment where every reasonable inference is to be drawn in favor of the non-movant"). There is no basis to disturb the jury's credibility findings.

Moreover, the jury was entitled to consider those comments in conjunction with evidence of Frattali's other harassing conduct in determining whether the totality of the circumstances created a hostile work environment for Sooroojballie. *See Alfano*, 294 F.3d at 378 ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim" as long as there is "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."). In particular, Sooroojballie submitted evidence that Frattali intentionally interfered with

10

Sooroojballie's professional advancement and potential promotions, drafted a series of false counseling memoranda, and falsely accused Sooroojballie of committing vandalism by intentionally sabotaging a boiler. There was more than sufficient basis, given the circumstances surrounding these race-neutral acts, and Sooroojballie's testimony regarding Frattali's comments, for the jury to consider these acts in connection with the hostile work environment claim. For example, Sooroojballie testified that Frattali conveyed to him that, if Sooroojballie declined the watch engineer position, Frattali would "stop writing [Sooroojballie] up, he's going to stop harassing [him], and he's going to stop doing whatever he was doing." J.A. at 541. Sooroojballie eventually rejected the offer for the position. In short, when considered in conjunction with Frattali's remarks, it was reasonable for the jury to infer that Frattali sought to interfere with Sooroojballie's employment in these various ways because of his race and national origin. *Cf. Owens*, 934 F.2d at 410 ("While the statements presented were not numerous, they were made by individuals with substantial influence over [the plaintiff's] employment.").

Accordingly, viewing the evidence of the harassing conduct Sooroojballie faced—including the offensive comments, the inability to advance within the Port Authority, the counseling memoranda, and the accusation of vandalism—in the light most favorable to him, there was more than sufficient evidence for the jury to find that Sooroojballie was subjected to a hostile work environment based upon his race and national origin, and thus the jury's findings must not be disturbed.

## III. Jury Instructions

Defendants take issue with two portions of the jury charge: the instruction on the effect necessary to establish a hostile work environment claim, and the lack of a "business decision" or "pretext" instruction. We review the district court's jury instructions *de novo* and will reverse the

11

district court's decision "only if the appellant shows that the error was prejudicial in light of the charge as a whole." *Japan Airlines Co. v. Port Auth. of New York & New Jersey*, 178 F.3d 103, 110 (2d Cir. 1999). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 153 (2d Cir. 1997) (quoting *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994)).

First, defendants object to the hostile work environment charge in that it did not state that the hostility must "alter" the terms of conditions of employment; rather, the district court's instruction provided that the environment must have "*affected* a term, condition, or privilege of employment." J.A. at 1334 (emphasis added). However, when the district court further defined hostile work environment, it instructed that "based upon the totality of the circumstances, the plaintiff must prove, by a preponderance of the evidence, that the workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive *to alter* the conditions of the plaintiff's employment and create an abusive working environment." *Id.* at 1335 (emphasis added). Reviewing the instruction as a whole, the use of the term "affected" in addition to the term "alter" did not lower Sooroojballie's legal burden or prejudice defendants in any way.

Second, defendants claim the district court improperly declined to charge the jury on "business decision" and "pretext" to guide the jury in evaluating the non-discriminatory reasons proffered by defendants for certain actions. When read in context, it is clear that the instruction that the district court read to the jury did not contain prejudicial error. The district court correctly instructed the jury that, as one of the elements, Sooroojballie was required to "establish that he was harassed because of his race and/or national origin." J.A. at 1335. The district court was not required to specifically instruct on business decision or pretext, which could have potentially confused the jury in the context of a hostile work environment case which centered not on any

12

particular business decision, but on harassing comments based on race and national origin. *See*

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 155 (2d Cir. 2010) ("[W]e think it is unwise for a

court to charge the jury that a plaintiff must prove that the employer's explanation of an adverse

action was a 'pretext.' Such an instruction has a likelihood of confusing the jury and adding

inappropriately to the plaintiff's burden."). In any event, defendants suggested legitimate reasons

for Frattali's actions throughout the trial, and were free to argue in summation, as they did, that

Frattali's decisions were sound and not because of Sooroojballie's race or national origin.

Therefore, the district court properly instructed the jury on the elements of a hostile work

environment claim, and it did not err when it declined to give a jury instruction on business

decision or pretext.

## IV.     Damages

### 1.   Emotional Distress Damages

Sooroojballie was awarded $2,160,000 in emotional distress damages, which defendants

argue is excessive. The "calculation of damages is the province of the jury." *Ismail v. Cohen*, 899

F.2d 183, 186 (2d Cir. 1990). Although "[w]e are required to police closely the size of awards

rendered in the trial courts within our Circuit," *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 147

(2d Cir. 2014), we will not "vacate or reduce a jury award merely because we would have granted

a lesser amount of damages," *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (quoting

*Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 566-67 (2d Cir. 1988)). Therefore, on review,

we consider "whether the award is so high as to shock the judicial conscience and constitute a

denial of justice." *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) (quoting *Mathie v. Fries*, 121

F.3d 808, 813 (2d Cir. 1997)). In making that determination, "we are bound by precedent

to compare the awards in this case with the awards in analogous cases." *Id.* at 176. Defendants

13

contend that the district court erred in refusing to grant a remittitur or, alternatively, a new trial on damages. We review the district court's decision for abuse of discretion. *Cross v. New York City Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005).

If an appellate court concludes that an award for damages is excessive, it is not necessary for the court to order a new trial. Instead, like a district court, "[i]t may give plaintiff an alternative by ordering a new trial unless plaintiff will consent to a remittitur in a specified amount." 11 Charles A. Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2820 (2d ed. 1995); *see also Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (finding remittitur appropriate when "the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error" (quoting *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993))). We have often invoked this option to set the remittitur when it is determined on appeal that the amount of damages cannot stand as a matter of law. *See, e.g.*, *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51-52 (2d Cir. 2015) (ordering "a new trial limited to the issue of damages unless [the plaintiff] agrees to a remittitur reducing the $1,000,000 compensatory damages award to $100,000"); *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 211 (2d Cir. 2014) (remanding "with instructions to grant a new trial on the issue of damages unless [the plaintiff] agrees to a remittitur reducing her award for past emotional distress to $100,000, her award for future emotional distress to $20,000, and her award for punitive damages to $100,000"); *DiSorbo*, 343 F.3d at 176 (remanding "for a new trial on damages, unless the plaintiff agrees to remit, resulting in $250,000 in compensatory damages and $75,000 in punitive damages"); *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) (remanding for a new trial "unless [the plaintiff] agrees to remit $125,000, and accepts a punitive damage award of $75,000").

14

In assessing whether a jury award for compensatory damages is excessive, courts in the Second Circuit have routinely identified three categories of damages for emotional distress: (1) garden variety; (2) significant; and (3) egregious:

> In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony. Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses. Egregious emotional distress claims yield the highest awards and are warranted only where the employer's conduct was outrageous and shocking or affected the physical health of the plaintiff.

*Maher v. All. Mortg. Banking Corp.*, No. 06-CV-05073 (DRH) (ARL), 2010 WL 3516153, at *2 (E.D.N.Y. Aug. 9, 2010) (citations omitted), *report and recommendation adopted by* 2010 WL 3521921 (E.D.N.Y. Sept. 1, 2010); *accord Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319-20 (S.D.N.Y. 2018); *see also Lore*, 670 F.3d at 178.

In the instant case, utilizing this helpful framework, we conclude that Sooroojballie's emotional distress damages were significant based upon the evidence presented at trial. Sooroojballie testified that, from the summer of 2013 until he left the Port Authority in October 2014, he suffered stress at work from the hostile work environment, resulting in insomnia, anxiety, and depression, for which he was prescribed medication. He also testified about how the stress strained his relationship with his family and led to his excessive drinking. There was further evidence that, between May 2014 and January 2015, he attended 14 counseling sessions with social worker Dr. Stanley Schneider, and continued to attend the sessions for one to two months after he left the Port Authority.

In cases with "significant" emotional distress claims, awards "usually range from $50,000.00 to $200,000.00," but "[c]ourts have, in some instances, upheld awards exceeding

15

$200,000.00." *Emamian v. Rockefeller Univ.*, No. 07 CIV. 3919 (DAB), 2018 WL 2849700, at *16, *18 (S.D.N.Y. June 8, 2018) (collecting cases). For example, in *Emamian v. Rockefeller University*, the district court found that the distress resulting from discrimination was in the significant range, given the plaintiff's "own testimony regarding her mental state, her trichotillomania[, a disorder that involves urges to pull out one's body hair,] and physical manifestations of her emotional suffering, as well as the corroborative medical testimony she presented." *Id.* at *17. The district court then reduced her $2 million jury award to $200,000. *Id.*; *see also Marchisotto v. City of New York*, No. 05 CIV. 2699 (RLE), 2007 WL 1098678, at *10 (S.D.N.Y. Apr. 11, 2007) (finding $300,000 award for significant emotional distress was reasonable where psychologist corroborated that the plaintiff suffered from posttraumatic stress disorder, major depressive disorder, and had difficulty performing sexually), *aff'd*, 299 F. App'x 79 (2d Cir. 2008); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 363 (E.D.N.Y. 1999) (holding that $250,000 award for emotional distress was not excessive where the plaintiff's testimony, corroborated by his social worker, established that he suffered from years of pervasive and severe harassment).

Although Sooroojballie urges the Court to uphold the jury verdict because the emotional distress supports an award in the "egregious" category, we find that argument unpersuasive. In particular, Sooroojballie did not provide evidence of lasting psychological effects from the hostile work environment, and had no further contact with his internist (who was treating his mental health issues) after he began his new job with the City of New York on October 27, 2014.[6] *See Menghi v. Hart*, 745 F. Supp. 2d 89, 107 (E.D.N.Y. 2010) ("Awards at the high end of the spectrum may be warranted in cases that generally contain evidence of debilitating and permanent alterations in

---

[6] Although Sooroojballie continued to see a social worker after he began his new job, he stopped doing so after one or two months.

16

lifestyle." (quotation marks omitted)), *aff'd*, 478 F. App'x 716 (2d Cir. 2012). In short, Sooroojballie's evidence falls far short of the type of shocking, prolonged discriminatory conduct and/or long-term emotional harm that are part and parcel of the larger damage awards that can be sustained for egregious cases. *See, e.g.*, *Turley*, 774 F.3d at 146, 163 (upholding an award of $1.32 million when the plaintiff was subjected to "an extraordinary and steadily intensifying drumbeat of racial insults, intimidation, and degradation over a period of more than three years," resulting in post-traumatic stress disorder, short-term adjustment disorder, depression, a panic disorder, and multiple hospitalizations). Here, Sooroojballie's proof regarding emotional distress did not contain the evidence of prolonged mental harm or negative, long-term prognosis that is typically present in cases with awards around $500,000. *See, e.g.*, *Ramirez v. New York City Off–Track Betting Corp.*, 112 F.3d 38, 40, 41 n.1 (2d Cir. 1997) (upholding district court's decision to reduce $1.14 million pain and suffering award to $500,000 in Title VII case where evidence demonstrated that the plaintiff was unable to work and was "rendered permanently non-functional"); *Ravina v. Columbia Univ.*, No. 16-CV-2137 (RA), 2019 WL 1450449, at *12 (S.D.N.Y. Mar. 31, 2019) (granting motion for remittitur and reducing award from $750,000 to $500,000 in a retaliation case where the plaintiff suffered significant emotional distress; the plaintiff testified about her "insomnia, a herniated disc, anxiety, weight gain, and suicidal thoughts" and her psychiatrist testified that the plaintiff's "prognosis was 'poor'"); *Komlosi v. Fudenberg*, No. 88 CIV. 1792 HBP, 2000 WL 351414, at *17 (S.D.N.Y. Mar. 31, 2000) (awarding the plaintiff $500,000 for non-economic loss where psychological injury "destroyed [the plaintiff's] ability to practice his profession"), *aff'd*, No. 01-89(XAP), 2002 WL 34244996 (2d Cir. May 13, 2002); *see also Watson v. E.S. Sutton, Inc.*, No. 02 CIV. 2739 (KMW), 2005 WL 2170659, at *15 (S.D.N.Y. Sept. 6, 2005) (finding that $500,000 emotional distress damages was excessive, and noting that "[the plaintiff]

17

has not pointed us to any comparable cases–that is, cases with no permanent psychological damage or disability resulting from the harassment–with awards so high as the one the jury here gave her"), *aff'd*, 225 F. App'x 3 (2d Cir. 2006).

Therefore, on this record, the jury's $2,160,000 award for emotional distress damages far surpasses the upper limit of the reasonable range and "shock[s] the judicial conscience." *DiSorbo*, 343 F.3d at 183. Instead, given the evidence in this case and our survey of comparable cases, we conclude that $250,000 is the upper limit of the reasonable range for the significant emotional distress that was described in Sooroojballie's testimony. Accordingly, we grant a new trial as to Sooroojballie's emotional distress damages unless he accepts a remittitur of the award to $250,000.[7]

### 2. Punitive Damages

The jury also awarded Sooroojballie $150,000 in punitive damages against Frattali. Defendants request that the punitive damages award be overturned on the ground that it is unconstitutionally excessive. We review *de novo* a district court's decision regarding the constitutionality of a punitive damages award. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001).

Judicial review of a due process challenge to a punitive damages award is guided by three factors articulated by the Supreme Court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559,

---

[7] Because this amount is less than the $300,000 limit set forth by Title VII, we decline to resolve the Port Authority's argument that the jury's award exceeded the statutory cap at this juncture.

18

575 (1996)). To merit punitive damages, the evidence must demonstrate that the "defendant's conduct was driven by an evil motive or intent, or that it involved a reckless or callous indifference to plaintiff's federally protected rights." *Carrion v. Agfa Constr., Inc.*, 720 F.3d 382, 387 (2d Cir. 2013). If punitive damages are warranted, they should not "result in the financial ruin of the defendant" or "constitute a disproportionately large percentage of a defendant's net worth." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) (citing *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373 (2d Cir. 1988)).

With respect to defendants' argument that the award is excessive, after considering the three *Gore* factors—reprehensibility, ratio to compensatory damages, and civil penalties authorized and imposed—we conclude that a reduction of punitive damages is not warranted. First, as to reprehensibility, we emphasize the malicious nature of Frattali's discriminatory conduct, including not only a pattern of harassing behavior, but also evidence of a false accusation that Sooroojballie sabotaged equipment. *See Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) (explaining how "some courts have noted the relative reprehensibility of intentional discrimination as distinguished from some other forms of purely economic injury" (citation omitted)). The evidence of Frattali's conduct and malicious motive provided the jury with more than a sufficient basis for the jury's decision to award punitive damages, and to do so in the amount of $150,000.

Second, whether utilizing the original compensatory damage award or the remittitur of $250,000, we find that the ratio between the compensatory damages award and punitive damages award raises no constitutional issue. *See Campbell*, 538 U.S. at 425 (noting that a "[punitive damages] award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety"). In other words, the punitive damages are "reasonable and

19

proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426.

Finally, the civil penalties that have been authorized or imposed in comparable cases are consistent with the $150,000 punitive damages award here. In the past, we have referred to the amount set by the New York City Human Rights Law, which permits the imposition of civil fines up to $250,000 for "unlawful discriminatory practice[s]" stemming from "willful, wanton or malicious" conduct. N.Y.C Admin. Code § 8-126(a); *see also Thomas*, 652 F.3d at 149. Moreover, the award here is not only well below that benchmark but is also consistent with punitive damages awards in other discrimination cases. *See Thomas*, 652 F.3d at 149-50 (upholding district court's remittitur of punitive damages award from $1.6 million to $190,000); *see also Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 370 (S.D.N.Y. 2018) ("Comparable cases in the context of Title VII claims are constrained by the statutory caps, and have allowed plaintiffs . . . to recover $300,000 [in punitive damages on state discrimination claims] or the equivalent maximum statutory cap.").

Defendants also argue that Frattali was denied due process when the district court precluded testimony on his net worth. Generally, "the preferred method of [handling punitive damages] is to delay trial as to the amount of an award of punitive damages until the usual issues of liability and compensatory damages have been tried, along with the matter of whether the defendant's conduct warrants any award of punitive damages at all." *Smith*, 861 F.2d at 374. Then, if warranted, the parties may present evidence relevant to punitive damages. *Id.* We have warned, however, that "[t]he incompleteness of the record as to [a defendant's] net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award." *Id.* at 373.

20

As Sooroojballie correctly points out, "[defendants'] counsel neither objected nor tried to explain that she was trying to prove Frattali's net worth in reference to the punitive damages claim." Appellee's Br. at 54. At trial, defendants' counsel provided no context for why counsel was asking Frattali questions about the monetary loss he would suffer from being personally sued; instead of explaining that it was required for the punitive damages analysis, in the midst of other questioning, counsel simply stated to the district court that it was "in connection with that liability," without mentioning the issue of punitive damages. J.A. at 1253-54. Such a statement does not adequately frame the potential relevance of the testimony for the district court on the issue of punitive damages, and thus Frattali's argument fails. *See United States v. Pugliese*, 712 F.2d 1574, 1580 (2d Cir. 1983) ("Unless the basis for proposed admission is obvious, it is the burden of counsel who seeks admission to alert the court to the legal basis for his proffer.").

Nor did defendants utilize other available avenues to present Frattali's financial circumstances. For example, defendants did not request a bifurcated trial on punitive damages, *see Smith*, 861 F.2d at 374 (noting that "[t]he trial court was not required to order this bifurcation sua sponte"), nor did defendants seek to have the court exercise its discretion to consider such evidence in considering a motion to reduce the award by remittitur. Given Frattali's role in creating an incomplete record of his finances, we will not say that his due process rights were violated in this case.

In sum, having analyzed the evidence in the record and the applicable law, we find no basis to vacate or reduce the jury's award of punitive damages against Frattali.

V.    **Attorneys' Fee Award**

On January 17, 2019, the district court granted Sooroojballie's motion for attorneys' fees in the amount of $177,882.70, in an electronic docket entry which contained no reasoning. "We

21

review a district court's award of attorney's fees for abuse of discretion." *Cabala v. Crowley*, 736 F.3d 226, 229 (2d Cir. 2013) (per curiam). We utilize this standard of review because "[t]he district court observes the parties' litigation directly and is thus best situated to consider the case-specific factors relevant to a reasonable fee assessment." *Id.*

Although we recognize that the abuse of discretion standard is a highly deferential one, "'abuse of discretion' is not the equivalent of 'unreviewable.'" *In re Bolar Pharm. Co., Inc., Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (per curiam). In the past, we have found an abuse of discretion when district courts issued sanctions or deviated from the lodestar figure without sufficient explanation. *See, e.g.*, *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007); *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 505-06 (2d Cir. 1980). In this case, even though the district court approved the fee award without deviating from counsel's proposed lodestar figure, we are unable to assess the reasonableness of the fees in the absence of any explanation by the district court. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("[T]he district court [should] provide a concise but clear explanation of its reasons for the fee award."). In fact, the district court granted the fee application in full before defendants' time to respond, under the Federal Rules of Civil Procedure, had expired.[8] Because the district court granted the motion without any legal analysis, we are unable to discern whether it applied the correct legal standard and properly exercised its discretion in determining that the fee award was indeed

---

[8] Pursuant to Local Civil Rule 6.1(b) of the Eastern District of New York, defendants' opposition was due on January 18, 2019, fourteen days after Sooroojballie filed his motion on January 4, 2019. *See also* Fed. R. Civ. P. 6(a). The district court issued its electronic order on January 17, 2019. Sooroojballie counters that, although the district court granted his motion for fees before defendants had an opportunity to file opposition papers, defendants explained their position in their motion for reconsideration, which the district court also rejected. That argument, however, overlooks the fact that the standard of review is much higher on a motion for reconsideration, and that the denial of the motion for reconsideration was issued the same day that that motion was filed, in an electronic docket entry that also did not articulate the district court's reasoning.

reasonable. *See In re Bolar Pharm. Co. Sec. Litig.*, 966 F.2d at 732 (stating that "[i]f we are to be satisfied that a district court has properly exercised its discretion, we must be informed by the record of why the district court acted as it did"); *see generally United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (en banc) ("We cannot uphold a discretionary decision unless we have confidence that the district court exercised its discretion and did so on the basis of reasons that survive our limited review.").

Accordingly, we remand the issue to the district court to allow it to fully consider defendants' opposition and to provide the grounds for its discretionary decision in connection with the fees motion.

\* \* \*

We have considered the parties' remaining arguments and conclude that they are without merit. For the foregoing reasons, we **AFFIRM IN PART** and **VACATE IN PART** the judgment of the district court, and **REMAND** for proceedings consistent with this order.

> FOR THE COURT:
> Catherine O'Hagan Wolfe, Clerk of Court

23